# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **THOMAS W. SALYERS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15cv00014 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Thomas W. Salyers, ("Salyers"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

Case 2:15-cv-00014-PMS   Document 15   Filed 10/27/16   Page 1 of 26   Pageid#: 1172

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is '"substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Salyers protectively filed an application[1] for SSI[2] on December 23, 2010, alleging disability as of December 15, 2006,[3] due to chronic back pain resulting from a spinal fusion of the L5-S1 discs; migraines; sinus problems; nerve damage in right jaw; mutilated big toe of the left foot; bilateral knee pain; difficultly eating; nervousness; and inability to concentrate. (Record, ("R."), at 184-87, 203, 207, 216, 219.) The claim was denied initially and on reconsideration. (R. at 112-14, 117, 122-24, 126-28.) Salyers then requested a hearing before an administrative law judge, ("ALJ"). (R. at 129-30.) A video hearing was held on November 29, 2012, at which Salyers was represented by counsel. (R. at 36-57.)

---

[1] Salyers also filed an application for disability insurance benefits, ("DIB"); however, this application was dismissed because he had not worked long enough to qualify for disability benefits. (R. at 105-10.)

[2] On May 27, 2008, Salyers protectively filed an application for SSI alleging disability beginning August 4, 1998. (R. at 63.) The claim was denied initially and on reconsideration. (R. at 63.) Salyers then requested a hearing, which was held on November 18, 2010. (R. at 63.) By decision dated December 2, 2010, the ALJ denied Salyers's claim. (R. at 63-71.)

[3] At his hearing, Salyers amended his alleged onset date to December 23, 2010, the day of the application. (R. at 40.)

-2-

By decision dated December 7, 2012, the ALJ denied Salyers's claim. (R. at 16-29.) The ALJ found that Salyers had not engaged in substantial gainful activity since December 23, 2010, the date of his application. (R. at 18.) The ALJ found that the medical evidence established that Salyers suffered from severe impairments, namely back pain, status-post fusion surgery in 1998; cervical spine strain; neuropathic pain in the jaw and mouth due to traumatic injury and drug abuse damage; headaches; obesity; and history of cocaine abuse, but he found that Salyers did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 21.) The ALJ found that Salyers had the residual functional capacity to perform simple, routine, repetitive, unskilled light work[4] that did not require more than occasional kneeling, crawling, crouching, stooping, balancing, climbing and interaction with others, due to difficulty talking based on mouth and sinus conditions; that did not require more than frequent operation of foot controls, reaching, handling, fingering and feeling; and that did not require him to climb ladders, ropes or scaffolds or to work around concentrated exposure to temperature extremes, excessive noise and vibrations and work hazards. (R. at 22.) The ALJ found that Salyers had no past relevant work. (R. at 27.) Based on Salyers's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Salyers could perform, including jobs as a night cleaner, a library shelving clerk and a cafeteria attendant. (R. at 28.) Thus, the ALJ found that

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2015).

-3-

Salyers was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 28-29.) *See* 20 C.F.R. § 416.920(g) (2015).

After the ALJ issued his decision, Salyers pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 1-6.) Salyers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2015). The case is before this court on Salyers's motion for summary judgment filed January 11, 2016, and the Commissioner's motion for summary judgment filed February 16, 2016.

## *II. Facts*

Salyers was born in 1979, (R. at 184), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). Salyers has a high school education, two years of college and no past work experience. (R. at 42, 208.) Salyers admitted that he had never had a job lasting for more than a couple of months. (R. at 42.) He stated that he attempted to be a self-employed computer repairman, but was unable to perform the job because of his inability to concentrate. (R. at 42.) Salyers stated that he fell on a machete and injured his mouth. (R. at 42-43.) He stated that he snorted cocaine, which damaged his sinuses and throat. (R. at 43-44.) Salyers testified that he did not take any medication for depression or anxiety. (R. at 45.) He stated that he was receiving counseling for his symptoms of anxiety and depression. (R. at 46.) Salyers reported that his mother was homebound and that he "waits on her, giving her oxygen and [meeting her] other needs." (R. at 824.) In discussing helping his mother, Salyers stated that, "I do all the driving and

-4-

shopping because she won't leave the house." (R. at 1089.)

Vocational expert, Asheley Wells, also testified at Salyers's hearing. (R. at 54-56.) Wells was asked to consider a hypothetical individual of Salyers's age, education and lack of work experience, who would be limited to simple, routine, repetitive, unskilled light work that did not require exposure to hazards or climbing of ladders, ropes or scaffolds; that did not require more than frequent use of the hands and arms for reaching, handling, fingering, feeling and no more than frequent foot control operation; that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, crawling and interaction with others; and that did not require concentrated exposure to temperature extremes, excessive vibration and excessive noise. (R. at 54-55.) Wells stated that the individual could perform jobs existing in significant numbers in the national economy, including those of a night cleaner, a library shelving clerk and a cafeteria attendant. (R. at 55.) Wells stated that there would be no jobs available if the same hypothetical individual would be off task 25 percent of the workday or workweek; had an inability to satisfactorily interact with others and to deal with work stress; and would miss more than four days of work a month. (R. at 56.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Brian Strain, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Andrew Bockner, M.D., a state agency physician; Bristol Regional Medical Center; Dr. Galileo T. Molina, M.D.; Dr. B. Keith Elliott, D.D.S.; Dr.

-5-

Ronald F. Godat, D.D.S.; Dr. Maria Bryan, D.D.S.; Dr. Jeff Montgomery, D.D.S.; Dr. Stephen J. Yallourakis, D.D.S.; Dr. Newton Carroll Mullins, D.D.S.; Dr. Stephen M. Kimbrough, M.D.; Dr. Maurice E. Nida, D.O.; Dr. Robert D. Kilgore, D.M.D.; Robert S. Spangler, Ed.D., a licensed psychologist; Lonesome Pine Hospital; Dr. Esther F. Adade, M.D.; Norton Community Hospital; Frontier Health; Tri-State Mountain Neurology Associates; Dr. William Humphries, M.D.; and University of Virginia Health System. Salyers's attorney also submitted medical records from Lonesome Pine Hospital and Frontier Health to the Appeals Council.[5]

In August 1998, Salyers underwent a bilateral L5-S1 decompression, laminectomy, diskectomy and interbody arthrodesis to treat his five-year history of back pain resulting from a soccer injury. (R. at 274-85.)

Salyers received much dental and endodontic care for his teeth from June 2008 through August 2012; some of this treatment was for damage sustained after Salyers fell on a machete that penetrated into his mouth. (R. at 344-413, 440-79, 482-513, 581-84, 966-70.)

On August 7, 2008, Dr. Stephen M. Kimbrough, M.D., performed a neurological consultation. (R. at 585-86.) Salyers reported that he fell on a machete while cutting brush and it penetrated into his mouth hitting his teeth. (R. at 585.)

_____

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Salyers reported an aching constant pain that fluctuated in intensity. (R. at 585.) Dr. Kimbrough reported that Salyers's pain was not typical of trigeminal neuralgia or neuritic pain. (R. at 585.) Dr. Kimbrough found no evidence of any specific nerve injury other than that which was localized to the area that was directly traumatized. (R. at 585.) Dr. Kimbrough prescribed neuropathic medication. (R. at 586.) On October 20, 2008, Salyers reported that his medication had been helpful overall; however, he continued to complain of neuropathic pain. (R. at 429.) Dr. Kimbrough reported that Salyers's examination was normal. (R. at 429.)

On April 20, 2009, Salyers continued to complain of burning and stinging in his jaw. (R. at 428.) He reported that his pain symptoms had improved with medications. (R. at 428.) Examination was normal, with the exception of hypersensitivity in his right jaw. (R. at 428.) On June 30, 2009, Salyers complained of neuropathic pain in his mouth and right jaw. (R. at 427.) Although Salyers reported increased burning, stinging and pain in his upper teeth area, he stated that his medications had "helped overall." (R. at 427.) Dr. Kimbrough diagnosed neuropathic pain in the mouth and right jaw. (R. at 427.) On October 22, 2009, Salyers's examination was normal, with the exception of hypersensitivity in the right jaw and "a little bit" in the upper lip area. (R. at 434.)

On March 10, 2010, Salyers reported that his pain medication regimen helped him to tolerate his pain. (R. at 433.) Dr. Kimbrough reported that Salyers's examination was normal, with the exception of hypersensitivity of the right jaw. (R. at 433.) On September 2, 2010, Salyers reported that the pain in his left upper jaw area had resolved. (R. at 432.) He complained of increased back pain. (R. at

432.) Salyers's examination was normal, with the exception of a "little bit" of reduced reflex in his ankles and tenderness in his right S1 joint. (R. at 432.) On September 28, 2010, Salyers requested a medication refill. (R. at 603.) Dr. Kimbrough refused the request, stating that, if Salyers was taking the medication as prescribed, he would have extra medication. (R. at 603.)

On January 28, 2011, Dr. Kimbrough refused to complete a disability form for Salyers. (R. at 602.) On March 24, 2011, Salyers complained of low back pain and neuropathic pain in his mouth. (R. at 601.) Salyers reported that he was doing relatively well with his medications. (R. at 601.) Dr. Kimbrough reported that there was no evidence of aphasia, agnosia or apraxia. (R. at 601.) Salyers had normal reflexes in the upper and lower extremities; tenderness in his back; reduced straight leg raising; reduced reflexes in the ankles; and normal strength and coordination. (R. at 601.) Also on that day, Dr. Kimbrough stated that Salyers was unable to engage in any substantial gainful activity because of his physical and mental impairments related to chronic severe neuropathic pain in his mouth area. (R. at 579.)

On February 16, 2010, Salyers saw Dr. Esther F. Adade, M.D., with complaints of back pain. (R. at 573.) Salyers also reported anxiety and depression. (R. at 573.) Dr. Adade noted that Salyers's affect was normal. (R. at 573.) Dr. Adade diagnosed chronic pain and asthma, stable. (R. at 573.) On May 20, 2010, Salyers complained of a cyst behind his left knee. (R. at 572.) Salyers did not complain of depression or anxiety, and it was noted that he had a normal affect. (R. at 572.) On June 4, 2010, an ultrasound of Salyers's right knee was normal. (R. at

-8-

526.) On August 4, 2010, Salyers saw Dr. Adade to discuss the results of his ultrasound. (R. at 571.) Salyers did not complain of depression or anxiety, and it was noted that he had a normal affect. (R. at 571.) On August 27, 2010, x-rays of Salyers's lumbar spine showed postoperative changes at the L5-S1 level. (R. at 567.) On September 24, 2010, Salyers did not complain of depression or anxiety, and it was noted that he had a normal affect. (R. at 570.) Dr. Adade diagnosed myofascial pain, sinusitis and nicotine dependence. (R. at 570.) On November 17, 2010, a CT scan of Salyers's head was normal. (R. at 563.) Also on that day, a CT scan of Salyers's paranasal sinuses showed chronic pansinusitis with exacerbation. (R. at 565.) On December 1, 2010, Salyers complained of chronic pain. (R. at 569.) Salyers did not complain of depression or anxiety, and it was noted that he had a normal affect. (R. at 569.)

On April 12, 2010, Salyers presented to the emergency room at Lonesome Pine Hospital, ("Lonesome Pine"), for sinusitis and a cyst to the left knee. (R. at 523-24.) On August 27, 2010, Salyers presented to the emergency room at Lonesome Pine for complaints of back pain. (R. at 528-29.) He was diagnosed with acute low back pain and lumbar sprain. (R. at 529.) On November 17, 2010, Salyers presented to the emergency room with complaints of migraine headaches. (R. at 781-89.) He was diagnosed with a headache and sinus headache. (R. at 783, 788.) On June 7, 2011, Salyers presented to the emergency room with complaints of sinus congestion and pressure. (R. at 772-80.) He was diagnosed with acute sinusitis. (R. at 774.)

On October 26, 2010, Robert S. Spangler, Ed.D., a licensed psychologist,

evaluated Salyers at the request of Salyers's attorney.[6] (R. a 542-46.) Spangler reported that Salyers had awkward gross motor movements; that he had a stiff gait; he demonstrated good concentration; and was appropriately persistent on tasks. (R. at 542.) Salyers reported that his medical and mental problems began at age 15 when he started using alcohol; smoking marijuana; taking pain pills; using IV drugs; snorting cocaine; and "a lot of stuff." (R. at 542.) He stated that he stopped consuming alcoholic beverages at age 21 and ceased all street drug usage in August of 2009. (R. at 542.) Salyers had adequate recall of remote and recent events. (R. at 544.) Spangler reported that Salyers was in obvious discomfort; his motor activity was calm; his affect was appropriate; his mood was irritable; his judgment and insight were consistent with high average intelligence; his stream of thought was goal-oriented; his associations were logical; his thought content was nonpsychotic; he was emotionally stable; and he had adequate social skills. (R. at 544.) Spangler reported that, due to Salyers's history of polysubstance dependence and alcohol abuse, he did not have the judgment necessary to handle his own financial affairs. (R. at 545.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV), was administered, and Salyers obtained a full-scale IQ score of 112. (R. at 545.) Spangler diagnosed pain disorder, chronic, secondary to general medical condition, moderate; alcohol abuse, full remission by report; and polysubstance dependence, full remission by report. (R. at 546.) Spangler assessed Salyers's then-current Global Assessment of Functioning, ("GAF"),[7] score at 55.[8]

---

[6] Spangler noted that Salyers had left a voice message before office hours stating that he would be late for his appointment. (R. at 542.) Salyers stated that he would arrive at 2:00 p.m. rather than 1:00 p.m.; however, he arrived at 2:26 p.m. (R. at 542.)

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC

-10-

(R. at 546.) Spangler noted that Salyers needed mental health treatment for his pain disorder, which impacted his reliability. (R. at 546.)

Spangler completed a mental assessment, indicating that Salyers had a limited, but satisfactory, ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration, while on prescribed medication; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 547-49.) He opined that Salyers was seriously limited in his ability to understand, remember and carry out detailed and simple job instructions. (R. at 548.) Spangler opined that Salyers had no useful ability to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 548.) Spangler opined that Salyers would be absent from work more than two days a month. (R. at 549.)

On January 26, 2011,[9] Salyers was seen by James Kegley at Frontier

---

AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[9] Salyers did not keep his appointments with Kegley on February 7, 2011; March 25, 2011; April 4, 2011; June 13, 2011; July 7, 2011; July 14, 2011; July 21, 2011; July 28, 2011; August 17, 2011; September 8, 2011; September 15, 2011; September 22, 2011; September 29, 2011; October 6, 2011; October 13, 2011; October 20, 2011. (R. at 833-34, 836-38, 840, 844, 848, 950-51, 953-55, 957-58.)

-11-

Health[10] for depression and anxiety related to multiple life stressors. (R. at 849-74.) Kegley diagnosed depressive disorder; anxiety disorder, not otherwise specified; and nicotine dependence. (R. at 858.) Kegley assessed Salyers's then-current GAF score at 50,[11] with his highest and lowest GAF scores being 50 within the past six months. (R. at 858.) On February 21, 2011, Kegley reported that Salyers's mood was mildly depressed with congruent effect. (R. at 846.) Salyers reported that he would become anxious when in public, stating that, "I hate the public with a passion." (R. at 846.) He reported that he stayed in his house and played "video games and movies" or spent time on the internet. (R. at 846.) On March 8, 2011, Kegley reported that Salyers's mood was mildly depressed with congruent effect. (R. at 845.) Salyers stated that, since his home was being renovated, "I've been getting out a lot more." (R. at 845.) On April 18, 2011, Kegley reported that Salyers's mood was mildly depressed with congruent affect. (R. at 842.) Salyers reported that, because his home was being renovated, he was getting out some. (R. at 842.) He stated that, "I've practically been living at Lowe's" by running errands. (R. at 842.) Salyers was discharged on November 10, 2011, due to his failure to return for further services. (R. at 945-47.) It was noted that Salyers attended only three sessions. (R. at 945.)

On February 25, 2011, Dr. Galileo Molina, M.D., refused to complete a disability form, stating that the form should be completed by an occupational

---

[10] Salyers completed a court-ordered short-term substance abuse program at Frontier Health in 2008 for a conviction stemming from a possession of marijuana charge. (R. at 889-902-03.)

[11] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-12-

therapist. (R. at 807.) On May 16, 2011, Salyers requested an increase of frequency of his Lortab. (R. at 805.) He stated that the medicine improved his pain to a tolerable level, but that it was not long-lasting. (R. at 805.) Dr. Molina diagnosed chronic low back pain, status-post lumbar laminectomy with disc prosthesis; chronic pansinusitis; and obesity. (R. at 805.) On August 5, 2011, Salyers complained of low back pain and pain in his abdomen. (R. at 804.)

On March 24, 2011, Dr. Brian Strain, M.D., a state agency physician, reported that Salyers had the residual functional capacity to perform light work. (R. at 84-85.) He opined that Salyers was limited to occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; frequent balancing; and never climbing ladders, ropes or scaffolds. (R. at 84-85.) No manipulative, visual or communicative limitations were noted. (R. at 85.) Dr. Strain opined that Salyers should avoid working around concentrated exposure to hazards, such as machinery and heights. (R. at 85.)

On March 28, 2011, Dr. John C. Mason, M.D., a physician with University of Virginia Health System, ("UVA"), saw Salyers for evaluation of his nasal septal deviation, nasopharyngeal stenosis, sinusitis and velopharyngeal reflux. (R. at 639-40.) Salyers admitted to multiple years of illicit nasally-inhaled drug abuse. (R. at 639.) Salyers was nearly three hours late for his appointment. (R. at 639.) A nasal endoscopy was performed. (R. at 639.) Dr. Mason diagnosed nasal septal perforation; left nasopharyngeal complete stenosis; circumferentially nasopharyngeal stenosis with incomplete velopharyngeal closure on the right; uvula necrosis; intranasal thick synechia bilaterally; tobacco abuse; and history of

-13-

illicit drug use intranasally. (R. at 640.) On May 13, 2011, Dr. J. Jared Christophel, M.D., a physician with UVA, saw Salyers for significant velopharyngeal insufficiency, ("VPI"), and nasopharyngeal stenosis, resulting from a history of significant inhaled drug use. (R. at 632-34, 641-45.) Salyers reported nasal regurgitation of both solids and liquids when he ate, right-sided facial pain and headaches. (R. at 632.) His mood and affect were appropriate. (R. at 633.) Dr. Christophel diagnosed VPI, choanal atresia and nasal septal perforation. (R. at 634.)

On July 8, 2011, Dr. Spencer Payne, M.D., a physician with UVA, saw Salyers for evaluation of choanal atresia. (R. at 743-50.) Dr. Payne reported that Salyers's mood and affect were appropriate. (R. at 749.) A nasal endoscopy was performed. (R. at 744.) Dr. Payne diagnosed choanal atresia, tobacco abuse, bilateral otitis media with effusion and chronic daily headaches. (R. at 744-45, 749-50.) On December 6, 2011, Salyers was admitted for surgery to repair his Eustachian tube dysfunction and choanal stenosis. (R. at 990-94.) On December 28, 2011, Dr. Payne reported that Salyers was doing well postoperatively. (R. at 987-88.) Salyers continued to smoke cigarettes against medical advice. (R. at 987.)

On April 12, 2012, Salyers was admitted to UVA for a posterior pharyngeal flap to correct his velopharyngeal dysfunction. (R. at 908-31.) Upon admission, Salyers's mental status was normal; he had a normal gait; his reflexes were normal and symmetric; he had normal muscle strength throughout; and his sensation was grossly intact. (R. at 909.) On April 27, 2012, Salyers was doing well post-surgery. (R. at 972.) Salyers reported that his pain was moderately controlled with narcotic

-14-

medication. (R. at 972.)

On March 29, 2011, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Salyers did not allege depression or anxiety symptoms. (R. at 82-83.) He reported that a review of the medical evidence showed that Salyers had a normal mood and affect, and no mental health problems were reported; thus, there was no evidence of a severely limiting mental impairment. (R. at 82-83.)

On July 7, 2011, Salyers presented to the emergency room at Norton Community Hospital for complaints of severe jaw pain. (R. at 653-62.) He was diagnosed with a toothache. (R. at 659.)

On July 8, 2011, Dr. Robert McGuffin, M.D., a state agency physician, reported that Salyers had the residual functional capacity to perform light work. (R. at 97-99.) He opined that Salyers was limited to occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; frequent balancing; and never climbing ladders, ropes or scaffolds. (R. at 97-98.) No manipulative, visual or communicative limitations were noted. (R. at 98.) Dr. McGuffin opined that Salyers should avoid working around concentrated exposure to hazards, such as machinery and heights. (R. at 98.)

On July 14, 2011, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF, finding that Salyers suffered from a somatoform disorder and a substance addiction disorder. (R. at 95.) He opined that Salyers was mildly

-15-

restricted in his ability to perform his activities of daily living and in maintaining social functioning. (R. at 95.) Dr. Bockner opined that Salyers had no limitations in maintaining concentration, persistence or pace and that he had not experienced repeated episodes of decompensation of extended duration. (R. at 95.)

Salyers was treated at Tri-State Mountain Neurology Associates on September 22, 2011, and April 16, 2012, for neuropathic pain in his mouth and jaw; chronic degenerative spine disease; anxiety; and depression. (R. at 1034-37.) On September 22, 2011, Salyers reported that he was doing better overall with the pain medication. (R. at 1036.) He reported anxiety and depression related to situational problems with a girlfriend. (R. at 1036.) On April 16, 2012, Salyers reported that he was doing fairly well overall. (R. at 1034.) He complained of depression and anxiety related to situational problems with his girlfriend. (R. at 1034.) It was noted that Salyers's neuropathic pain in his mouth and jaw was stable, as well as his chronic degenerative spine disease. (R. at 1034.) Salyers was diagnosed with unspecified disease of the jaws; dysthymic disorder; generalized anxiety disorder; and degeneration of lumbar or lumbosacral intervertebral disc. (R. at 1034.)

On August 14, 2012, Dr. William Humphries, M.D., examined Salyers at the request of Disability Determination Services. (R. at 932-35.) Dr. Humphries reported that Salyers was oriented; that he had a normal speech; his thought content, memory and intelligence were within normal range; his affect and grooming were appropriate; and that he should be able to manage his own funds. (R. at 933.) Salyers's neck and occiput were tender to palpation posteriorly. (R. at

-16-

933.) His back was nontender with no significant kypohosis, scoliosis or spasms. (R. at 933.) Examination of Salyers's upper and lower extremities revealed no significant tenderness or deformity, with the exception of the left great toe soft tissues being reduced, some abnormal nail growth and some onychomycosis and tenderness. (R. at 933.) Salyers moved on and off the examination table slowly, guarding his back movement. (R. at 934.) Radial, median and ulnar nerve function were intact; his finger-to-nose test was performed adequately; he had no tremors or involuntary movements; fine manipulation was performed adequately; he had minimal antalgia on the right due to lumbar discomfort; tandem gait was performed adequately; he had normal strength in all extremities; and he had no motor or sensory loss in his lower extremities. (R. at 934.) Dr. Humphries diagnosed degenerative joint disease/degenerative disc disease of the lumbar spine, status-post fusion with ongoing chronic lumbar strain; chronic cervical strain; dyspnea on exertion, probably related to deconditioning; post-traumatic soft tissue loss of the left great toe; asthma by history; and probable chronic sinusitis. (R. at 934.)

Dr. Humphries completed a medical assessment, indicating that Salyers could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 934, 936-41.) He opined that Salyers could sit up to six hours in an eight-hour workday and that he could do so for up to one hour without interruption. (R. at 934, 937.) Dr. Humphries found that Salyers could stand and walk a total of six hours in an eight-hour workday and that he could do so for up to 30 minutes without interruption. (R. at 934, 937.) He opined that Salyers could frequently reach, handle, finger, feel, push, pull, operate

-17-

foot controls with the right foot, balance and kneel and occasionally climb, stoop, crouch and crawl. (R. at 938-39.) Dr. Humphries found that Salyers could frequently work around humidity, wetness and loud noise and occasionally operate a motor vehicle and work around unprotected heights; moving mechanical parts; dust, odors, fumes and pulmonary irritants; extreme cold and heat; and vibrations. (R. at 940.)

On October 3, 2012, Salyers saw Jennifer Fasel, M.S.Ed., at Frontier Health, upon referral from Salyers's attorney. (R. at 1072-73.) Salyers reported depression, anxiety and panic attacks. (R. at 1072.) He reported that his panic attacks started when he began dating. (R. at 1072.) Fasel diagnosed depressive disorder, not elsewhere classified; anxiety state, unspecified; and tobacco use disorder. (R. at 1072.) Fasel assessed Salyers's then-current GAF score at 55 with his highest GAF score being 55 and his lowest GAF score being 35[12] within the past six months. (R. at 1072.) On October 15, 2012, Salyers continued to report depression, anxiety and panic attacks. (R. at 1076-78.) He was diagnosed with depressive disorder; panic disorder, without agoraphobia; nicotine dependence; and cocaine dependence, in remission. (R. at 1077.) His then-current GAF score was assessed at 50, with his highest GAF score being 55 and his lowest GAF score being 50 within the past six months. (R. at 1077.) On October 29, 2012, Salyers saw Megan Sanders, M.A. (R. at 1088.) He reported that he was angry about certain life choices that he had made. (R. at 1088.) Salyers stated that, when he was in the sixth grade, he often had a severe cough along with his asthma. (R. at 1088.) He reported that he was so

---

[12] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

-18-

"disruptive to other students that they put me in a closet when I would get sick." (R. at 1088.) He attributed his "being a loner" to this. (R. at 1088.) Salyers reported some suicidal ideations. (R. at 1088.) Sanders reported that Salyers's mood was depressed, and his affect was congruent. (R. at 1088.)

On November 28, 2012, Salyers stated that he believed his anxiety and depression were due to him being in pain. (R. at 1089.) Sanders reported that Salyers's mood was normal, and his affect was congruent. (R. at 1089.) On January 8, 2013, Salyers's mood was dysthymic, and his affect was congruent. (R. at 1091.) He reported having headaches recently. (R. at 1091.)

On October 17, 2012, Spangler evaluated Salyers at the request of Salyers's attorney. (R. a 1039-41.) Salyers had adequate recall of remote and recent events. (R. at 1040.) Spangler reported that Salyers's motor activity was calm; his affect was flat; his mood was depressed; his judgment and insight were consistent with high average intelligence; his stream of thought was unremarkable; his associations were logical; his thought content was nonpsychotic; he was emotionally stable; and he had adequate social skills. (R. at 1039.)  The Personality Assessment Inventory, ("PAI"), was administered, which indicated that Salyers suffered from a somatoform disorder and a severe dysthymic disorder. (R. at 1041.)  Spangler diagnosed undifferentiated somatoform disorder, severe; dysthymic disorder, chronic, severe; anxiety disorder, not otherwise specified, mild; alcohol abuse, full remission by report; polysubstance dependence, full remission by report; average intelligence; and personality disorder, dependent, moderate. (R. at 1041.) Spangler assessed Salyers's then-current GAF score at 50. (R. at 1041.) Spangler noted that

-19-

Salyers needed mental health treatment for his dysthymic disorder, but that his personality disorder and somatoform disorder were resistant to treatment. (R. at 1041.)

Spangler completed a mental assessment, indicating that Salyers had a limited, but satisfactory, ability to use judgment and to maintain attention and concentration while on prescribed medication. (R. at 1043-45.) He found that he had a seriously limited ability to maintain personal appearance; to behave in an emotionally stable manner; to follow work rules; to relate to co-workers; to deal with the public; to interact with supervisors; to function independently; and to understand, remember and carry out simple job instructions. (R. at 1043-44.) Spangler opined that Salyers had no useful ability to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 1043-44.) Spangler opined that Salyers would be absent from work more than four days a month. (R. at 1045.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he

-20-

can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Salyers argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Salyers further argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 7-9.)

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 416.921(a) (2015). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out

-21-

and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 416.921(b) (2015). The Fourth Circuit held in *Evans v. Heckler,* that """[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.""" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's finding that Salyers did not suffer from a severe mental impairment. The ALJ noted that he was giving some weight to the opinions of Leizer and Dr. Bockner because their opinions were consistent with the medical evidence of record, which showed that Salyers sought very little mental health treatment. (R. at 20.) The ALJ also noted that he was giving Spangler's assessments little weight, in part, because they were not consistent with the medical evidence of record, which showed that Salyers sought very little mental health treatment. (R. at 20.) I note that Leizer's assessment was completed on March 29, 2011, and Dr. Bockner's assessment was completed on July 14, 2011. (R. at 82-83, 95.) According to their notes, it appears that Leizer and Dr. Bockner reviewed only Spangler's October 2010 assessment in making their findings with regard to Salyers's mental residual functional capacity. (R. at 82, 95.)

While it is true that Salyers sought very little mental health treatment, every

-22-

mental health practitioner who evaluated him diagnosed mental health impairments. Kegley diagnosed Salyers with a depressive disorder and an anxiety disorder in January 2011; as a result, Kegley assessed Salyers's then-current GAF score at 50, which indicated Salyers suffered from "serious symptoms … OR any serious impairment in social, occupational, or school functioning…." (R. at 858.) Salyers was diagnosed with a depressive disorder, panic disorder and anxiety in October and November 2012; during this period, his GAF score was assessed at 50. (R. at 1072, 1077, 1089.) In addition, Spangler saw Salyers in October 2012 and administered the PAI, which showed that Salyers suffered from a somatoform disorder and severe dysthymic disorder. (R. at 1041.) Spangler diagnosed a severe somatoform disorder; severe dysthmic disorder; mild anxiety disorder; and a moderate personality disorder. (R. at 1041.) He found that Salyers was seriously limited in his ability to follow work rules; to relate to co-workers; to deal with the public; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 1043-44.) Spangler opined that Salyers had no useful ability to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 1043-44.) Spangler opined that Salyers would be absent from work more than four days a month. (R. at 1045.) Since the state agency psychologists either did not have this evidence before them, or did not consider this evidence, in making their mental residual functional capacity findings, I do not find that their opinions amount to substantial evidence to support the ALJ's finding that Salyers did not suffer from a severe impairment.

-23-

Salyers further argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 7-9.) The ALJ found that Salyers had the residual functional capacity to perform simple, routine, repetitive, unskilled light work that did not require more than occasional kneeling, crawling, crouching, stooping, balancing, climbing and interaction with others, due to difficulty talking based on mouth and sinus conditions; that did not require more than frequent operation of foot controls, reaching, handling, fingering and feeling; and that did not require him to climb ladders, ropes or scaffolds or to work around concentrated exposure to temperature extremes, excessive noise and vibrations and work hazards. (R. at 22.) Based on my review of the record, I do not find that substantial evidence exists to support this finding.

The ALJ noted that he was giving great weight to the opinion of Dr. Humphries. (R. at 26.) Dr. Humphries opined that Salyers could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 934, 936.) He opined that Salyers could sit up to six hours in an eight-hour workday and that he could do so for up to one hour without interruption. (R. at 934, 937.) Dr. Humphries found that Salyers could stand and walk a total of six hours in an eight-hour workday and that he could do so for up to 30 minutes without interruption. (R. at 934, 937.) He opined that Salyers could frequently reach, handle, finger, feel, push, pull, operate foot controls with the right foot, balance and kneel and occasionally climb, stoop, crouch and crawl. (R. at 938-39.) Dr. Humphries found that Salyers could frequently work around humidity, wetness and loud noise and occasionally operate a motor vehicle and work around unprotected heights; moving mechanical parts;

-24-

dust, odors, fumes and pulmonary irritants; extreme cold and heat; and vibrations. (R. at 940.)

It appears that Dr. Humphries opined that Salyers would require a sit/stand option when he found that Salyers could sit for only one hour without interruption and stand and walk for only 30 minutes without interruption. (R. at 934, 937.) In addition, Dr. Humphries opined that Salyers could only occasionally work around dust, odors, fumes and pulmonary irritants. (R. at 940.) The ALJ failed to mention these restrictions. In addition, these restrictions were not included in the hypothetical questions to the vocational expert in determining if jobs existed that Salyers could perform.

The record shows that Salyers suffers from sinus infections and has a history of asthma, which would cause one to believe that pulmonary irritants would need to be avoided. (R. at 240, 305, 309, 361, 374, 416, 420, 468, 472, 535, 546, 555, 585, 632, 640, 755, 772, 908, 915, 932, 934, 983, 1000, 1023, 1041, 1076.) A CT scan of Salyers's paranasal sinuses performed in November 2010 showed chronic pansinusitis with exacerbation. (R. at 553.) In 2012, Salyers underwent surgery to repair his velopharyngeal insufficiency. (R. at 909.) In fact, the ALJ limited Salyers to no more than occasional interaction with others due to Salyers's difficulty talking based on mouth and sinus conditions. (R. at 22.) Based on this, I do not find that substantial evidence exists to support the ALJ's finding with regard to Salyers's physical residual functional capacity.

Based on the above reasoning, I find that substantial evidence does not exist

-25-

in the record to support the ALJ's finding that Salyers was not disabled. An appropriate Order and Judgment will be entered remanding Salyers's claim to the Commissioner for further consideration consistent with this Memorandum Opinion.

ENTERED: October 27, 2016.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

Case 2:15-cv-00014-PMS   Document 15   Filed 10/27/16   Page 26 of 26   Pageid#: 1197